# Presidential Authority to Decline to Execute Unconstitutional Statutes

This memorandum discusses the President's constitutional authority to decline to execute unconstitutional statutes.

November 2, 1994

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

I have reflected further on the difficult questions surrounding a President's decision to decline to execute statutory provisions that the President believes are unconstitutional, and I have a few thoughts to share with you. Let me start with a general proposition that I believe to be uncontroversial: there are circumstances in which the President may appropriately decline to enforce a statute that he views as unconstitutional.

First, there is significant judicial approval of this proposition. Most notable is the Court's decision in *Myers v. United States*, 272 U.S. 52 (1926). There the Court sustained the President's view that the statute at issue was unconstitutional without any member of the Court suggesting that the President had acted improperly in refusing to abide by the statute. More recently, in *Freytag v. Commissioner*, 501 U.S. 868 (1991), all four of the Justices who addressed the issue agreed that the President has "the power to veto encroaching laws . . . or even to disregard them when they are unconstitutional." *Id.* at 906 (Scalia, J., concurring); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-38 (1952) (Jackson, J., concurring) (recognizing existence of President's authority to act contrary to a statutory command).

Second, consistent and substantial executive practice also confirms this general proposition. Opinions dating to at least 1860 assert the President's authority to decline to effectuate enactments that the President views as unconstitutional. *See, e.g., Memorial of Captain Meigs*, 9 Op. Att'y Gen. 462, 469-70 (1860) (asserting that the President need not enforce a statute purporting to appoint an officer); *see also* attached annotations of Attorney General and Office of Legal Counsel opinions. Moreover, as we discuss more fully below, numerous Presidents have provided advance notice of their intention not to enforce specific statutory requirements that they have viewed as unconstitutional, and the Supreme Court has implicitly endorsed this practice. *See INS v. Chadha*, 462 U.S. 919, 942 n.13 (1983) (noting that Presidents often sign legislation containing constitutionally objectionable provisions and indicate that they will not comply with those provisions).

While the general proposition that in some situations the President may decline to enforce unconstitutional statutes is unassailable, it does not offer sufficient guidance as to the appropriate course in specific circumstances. To continue our conversation about these complex issues, I offer the following propositions for your consideration.

1. The President's office and authority are created and bounded by the Constitution; he is required to act within its terms. Put somewhat differently, in serving as the executive created by the Constitution, the President is required to act in accordance with the laws — including the Constitution, which takes precedence over other forms of law. This obligation is reflected in the Take Care Clause and in the President's oath of office.

2. When bills are under consideration by Congress, the executive branch should promptly identify unconstitutional provisions and communicate its concerns to Congress so that the provisions can be corrected. Although this may seem elementary, in practice there have been occasions in which the President has been presented with enrolled bills containing constitutional flaws that should have been corrected in the legislative process.

3. The President should presume that enactments are constitutional. There will be some occasions, however, when a statute appears to conflict with the Constitution. In such cases, the President can and should exercise his independent judgment to determine whether the statute is constitutional. In reaching a conclusion, the President should give great deference to the fact that Congress passed the statute and that Congress believed it was upholding its obligation to enact constitutional legislation. Where possible, the President should construe provisions to avoid constitutional problems.

4. The Supreme Court plays a special role in resolving disputes about the constitutionality of enactments. As a general matter, if the President believes that the Court would sustain a particular provision as constitutional, the President should execute the statute, notwithstanding his own beliefs about the constitutional issue. If, however, the President, exercising his independent judgment, determines both that a provision would violate the Constitution and that it is probable that the Court would agree with him, the President has the authority to decline to execute the statute.

5. Where the President's independent constitutional judgment and his determination of the Court's probable decision converge on a conclusion of unconstitutionality, the President must make a decision about whether or not to comply with the provision. That decision is necessarily specific to context, and it should be

200

reached after careful weighing of the effect of compliance with the provision on the constitutional rights of affected individuals and on the executive branch's constitutional authority. Also relevant is the likelihood that compliance or non-compliance will permit judicial resolution of the issue. That is, the President may base his decision to comply (or decline to comply) in part on a desire to afford the Supreme Court an opportunity to review the constitutional judgment of the legislative branch.

6.    The President has enhanced responsibility to resist unconstitutional provisions that encroach upon the constitutional powers of the Presidency. Where the President believes that an enactment unconstitutionally limits his powers, he has the authority to defend his office and decline to abide by it, unless he is convinced that the Court would disagree with his assessment. If the President does not challenge such provisions (i.e., by refusing to execute them), there often will be no occasion for judicial consideration of their constitutionality; a policy of consistent Presidential enforcement of statutes limiting his power thus would deny the Supreme Court the opportunity to review the limitations and thereby would allow for unconstitutional restrictions on the President's authority.

Some legislative encroachments on executive authority, however, will not be justiciable or are for other reasons unlikely to be resolved in court. If resolution in the courts is unlikely and the President cannot look to a judicial determination, he must shoulder the responsibility of protecting the constitutional role of the presidency. This is usually true, for example, of provisions limiting the President's authority as Commander in Chief. Where it is not possible to construe such provisions constitutionally, the President has the authority to act on his understanding of the Constitution.

One example of a Presidential challenge to a statute encroaching upon his powers that did result in litigation was *Myers v. United States*, 272 U.S. 52 (1926). In that case, President Wilson had defied a statute that prevented him from removing postmasters without Senate approval; the Supreme Court ultimately struck down the statute as an unconstitutional limitation on the President's removal power. *Myers* is particularly instructive because, at the time President Wilson acted, there was no Supreme Court precedent on point and the statute was not manifestly unconstitutional. In fact, the constitutionality of restrictions on the President's authority to remove executive branch officials had been debated since the passage of the Tenure of Office Act in 1867 over President Johnson's veto. The closeness of the question was underscored by the fact that three Justices, including Justices Holmes and Brandeis, dissented in *Myers*. Yet, despite the unsettled constitutionality of President Wilson's action, no member of the Court in *Myers* suggested that Wilson overstepped his constitutional authority — or even acted improperly — by refusing to comply with a statute he believed was unconstitutional. The Court in *Myers* can be seen to have implicitly vindicated the view that the President may

refuse to comply with a statute that limits his constitutional powers if he believes it is unconstitutional. As Attorney General Civiletti stated in a 1980 opinion,

> *Myers* is very nearly decisive of the issue [of Presidential denial of the validity of statutes]. *Myers* holds that the President's constitutional duty does not require him to execute unconstitutional statutes; nor does it require him to execute them provisionally, against the day that they are declared unconstitutional by the courts. He cannot be required by statute to retain postmasters against his will unless and until a court says that he may lawfully let them go. If the statute is unconstitutional, it is unconstitutional from the start.

*The Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation*, 4A Op. O.L.C. 55, 59 (1980).

7. The fact that a sitting President signed the statute in question does not change this analysis. The text of the Constitution offers no basis for distinguishing bills based on who signed them; there is no constitutional analogue to the principles of waiver and estoppel. Moreover, every President since Eisenhower has issued signing statements in which he stated that he would refuse to execute unconstitutional provisions. *See* annotations of attached signing statements. As we noted in our memorandum on Presidential signing statements, the President "may properly *announce* to Congress and to the public that he will not enforce a provision of an enactment he is signing. If so, then a signing statement that challenges what the President determines to be an unconstitutional encroachment on his power, or that announces the President's unwillingness to enforce (or willingness to litigate) such a provision, can be a valid and reasonable exercise of Presidential authority." *The Legal Significance of Presidential Signing Statements*, 17 Op. O.L.C. 131, 134 (1993). (Of course, the President is not obligated to announce his reservations in a signing statement; he can convey his views in the time, manner, and form of his choosing.) Finally, the Supreme Court recognized this practice in *Chadha*, 462 U.S. at 942 n.13: the Court stated that "it is not uncommon for Presidents to approve legislation containing parts which are objectionable on constitutional grounds" and then cited the example of President Franklin Roosevelt's memorandum to Attorney General Jackson, in which he indicated his intention not to implement an unconstitutional provision in a statute that he had just signed. These sources suggest that the President's signing of a bill does not affect his authority to decline to enforce constitutionally objectionable provisions thereof.

In accordance with these propositions, we do not believe that a President is limited to choosing between vetoing, for example, the Defense Appropriations Act and executing an unconstitutional provision in it. In our view, the President has the

authority to sign legislation containing desirable elements while refusing to execute a constitutionally defective provision.

We recognize that these issues are difficult ones. When the President's obligation to act in accord with the Constitution appears to be in tension with his duty to execute laws enacted by Congress, questions are raised that go to the heart of our constitutional structure. In these circumstances, a President should proceed with caution and with respect for the obligation that each of the branches shares for the maintenance of constitutional government.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*


**Brief Description of Materials**

Attorney General Opinions

1) *Memorial of Captain Meigs, 9 Op. Att'y Gen. 462 (1860)*: In this opinion the Attorney General concluded that the President is permitted to disregard an unconstitutional statute. Specifically, Attorney General Black concluded that a statute purporting to appoint an officer should not be enforced: "Every law is to be carried out so far forth as is consistent with the Constitution, and no further. The sound part of it must be executed, and the vicious portion of it suffered to drop." *Id.* at 469.

2) *Constitutionality of Congress' Disapproval of Agency Regulations by Resolutions Not Presented to the President, 4A Op. O.L.C. 21 (1980)*: In this opinion Attorney General Civiletti instructed Secretary of Education Hufstedler that she was authorized to implement regulations that had been disapproved by concurrent congressional resolutions, pursuant to a statutory legislative veto. The Attorney General noted that "the Attorney General must scrutinize with caution any claim that he or any other executive officer may decline to defend or enforce a statute whose constitutionality is merely in doubt." *Id.* at 29. He concluded, however, that "[t]o regard these concurrent resolutions as legally binding would impair the Executive's constitutional role and might well foreclose effective judicial challenge to their constitutionality. More important, I believe that your recognition of these concurrent resolutions as legally binding would constitute an abdication of the responsibility of the executive branch, as an equal and coordinate branch of government with the legislative branch, to preserve the integrity of its functions against constitutional encroachment." *Id.*

3) *The Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation, 4A Op. O.L.C. 55 (1980)*: Attorney General Civiletti, in answer to a congressional inquiry, observed that *"Myers* holds that the President's constitutional duty does not require him to execute unconstitutional statutes; nor does it require him to execute them provisionally, against the day that they are declared unconstitutional by the courts." *Id.* at 59. He added as a cautionary note that "[t]he President has no 'dispensing power,'" meaning that the President and his subordinates "may not lawfully defy an Act of Congress if the Act is constitutional. . . . In those rare instances in which the Executive may lawfully act in contravention of a statute, it is the Constitution that dispenses with the operation of the statute. The Executive cannot." *Id.* at 59-60.

4) *Letter for Peter W. Rodino, Jr., Chairman, House Judiciary Committee from William French Smith, Attorney General (Feb. 22, 1985)*: This letter discussed the legal precedent and authority for the President's refusal to execute a provision of the Competition in Contracting Act. The Attorney General noted that the decision "not to implement the disputed provisions has the beneficial byproduct of increasing the likelihood of a prompt judicial resolution. Thus, far from unilaterally nullifying an Act of Congress, the Department's actions are fully consistent with the allocation of judicial power by the Constitution to the courts." *Id.* at 8. The letter also stated that "the President's failure to veto a measure does not prevent him subsequently from challenging the Act in court, nor does presidential approval of an enactment cure constitutional defects." *Id.* at 3.

## Office of Legal Counsel Opinions

1) *Memorandum for the Honorable Robert J. Lipshutz, Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel (Sept. 27, 1977)*: This opinion concluded that the President may lawfully disregard a statute that he interprets to be unconstitutional. We asserted that "cases may arise in which the unconstitutionality of the relevant statute will be certain, and in such a case the Executive could decline to enforce the statute for that reason alone." *Id.* at 13. We continued, stating that "[u]nless the unconstitutionality of a statute is clear, the President should attempt to resolve his doubts in a way that favors the statute, and he should not decline to enforce it unless he concludes that he is compelled to do so under the circumstances." *Id.* We declined to catalogue all the considerations that would weigh in favor of non-enforcement, but we identified two: first the extent of the harm to individuals or the government resulting from enforcement; and, second, the creation of an opportunity for a court challenge through non-enforcement (*e.g., Myers*).

204

2) *Appropriations Limitation for Rules Vetoed by Congress, 4B Op. O.L.C. 731 (1980)*: In this opinion we rejected the constitutionality of a proposed legislative veto, prior to the Court's decision in *Chadha*. We opined that "[t]o regard this provision as legally binding would impair the Executive's constitutional role and would constitute an abdication of the responsibility of the Executive Branch." *Id.* at 734. It should be noted that the legislation in question was pending in Congress, and the possibility that President Carter would sign the legislation did not affect our analysis of the constitutional issue. We simply stated that, "if enacted, the [legislative veto provision] will not have any legal effect." *Id.*

3) *Issues Raised by Foreign Relations Authorization Bill, 14 Op. O.L.C. 37 (1990)*: This opinion also addressed then-pending legislation, in this case the foreign relations authorization bill for fiscal years 1990 and 1991. The opinion found that a provision of the bill was unconstitutional and severable. Regarding non-execution, the opinion stated that "at least in the context of legislation that infringes the separation of powers, the President has the constitutional authority to refuse to enforce unconstitutional laws." *Id.* at 50. The opinion concluded that "if the President chooses to sign H.R. 3792, he would be constitutionally authorized to decline to enforce" the constitutionally objectionable section. *Id.* at 37.

4) *Issues Raised by Provisions Directing Issuance of Official or Diplomatic Passports, 16 Op. O.L.C. 18 (1992)*: This opinion concluded that two statutory provisions that limited the issuance of official and diplomatic passports were unconstitutional and were severable from the remainder of the two statutes. On the question of non-execution, the opinion rejected "the argument that the President may not treat a statute as invalid prior to a judicial determination." *Id.* at 36. The opinion concluded that the Constitution authorizes the President to refuse to enforce a law that he believes is unconstitutional.

5) *The Legal Significance of Presidential Signing Statements, 17 Op. O.L.C. 131 (1993)*: This opinion discusses different categories of signing statements, including those construing bills to avoid constitutional problems and those in which the President declares "that a provision of the bill before him is flatly unconstitutional, and that he will refuse to enforce it." *Id.* at 133. The opinion concludes that such "uses of Presidential signing statements generally serve legitimate and defensible purposes." *Id.* at 137.

## Presidential Signing Statements

1) *Statement by the State Department (Announcing President Wilson's Refusal to Carry Out the Section of the Jones Merchant Marine Act of June 5, 1920, directing him to terminate treaty provisions restricting the Government's right to impose*

*discriminatory tonnage dues and tariff duties), 17 A Compilation of the Messages and Papers of the Presidents 8871 (Sept. 24, 1920) (Pres. Wilson)*: The State Department announced that it "has been informed by the President that he does not deem the direction contained in Section 34 of the so-called Merchant Marine Act an exercise of any constitutional power possessed by the Congress." *Id.* The statement also defended President Wilson's decision to sign the bill and noted that "the fact that one section of the law involves elements of illegality rendering the section inoperative need not affect the validity and operation of the Act as a whole." 5 Green Haywood Hackworth, *Digest of International Law* 324 (1943).

2) *Special Message to the Congress Upon Signing the Department of Defense Appropriation Act, Pub. Papers of Dwight D. Eisenhower 688 (July 13, 1955)*: President Eisenhower, in signing a bill (H.R. 6042) that contained a legislative veto, stated that the legislative veto "will be regarded as invalid by the executive branch of the Government in the administration of H.R. 6042, unless otherwise determined by a court of competent jurisdiction." *Id.* at 689.

3) *Memorandum on Informing Congressional Committees of Changes Involving Foreign Economic Assistance Funds, Pub. Papers of John F. Kennedy 6 (Jan. 9, 1963)*: President Kennedy stated that a provision in the bill he was signing contained an unconstitutional legislative veto. He announced that "[i]t is therefore my intention . . . to treat this provision as a request for information." *Id.*

4) *Statement by the President Upon Approving the Public Works Appropriations Act, Pub. Papers of Lyndon B. Johnson 104 (Dec. 31, 1963)*: President Johnson also found that a legislative veto provision was unconstitutional and stated that he would treat it as a request for information.

5) *Statement About Signing the Public Buildings Amendments of 1972, Pub. Papers of Richard Nixon 686 (June 17, 1972)*: President Nixon stated that a clause conditioning the use of authority by the executive branch on the approval of a congressional committee was unconstitutional. He ordered the agency involved to comply with "the acceptable procedures" in the bill "without regard to the unconstitutional provisions I have previously referred to." *Id.* at 687.

6) *Statement on Signing the Department of Defense Appropriation Act of 1976, Pub. Papers of Gerald R. Ford 241 (Feb. 10, 1976)*: President Ford stated that a committee approval mechanism was unconstitutional and announced that he would "treat the unconstitutional provision . . . to the extent it requires further Congressional committee approval, as a complete nullity." *Id.* at 242.

7) *Statement on Signing Coastal Zone Management Improvement Act of 1980, Pub. Papers of Jimmy Carter 2335 (Oct. 18, 1980)*: President Carter stated that a legislative veto provision was unconstitutional and that any attempt at a legislative veto would "not [be] regarded as legally binding." *Id.*

8) *Statement on Signing the Union Station Redevelopment Act of 1981, Pub. Papers of Ronald Reagan 1207 (Dec. 29, 1981)*: President Reagan stated that a legislative veto was unconstitutional and announced that "[t]he Secretary of Transportation will not . . . regard himself as legally bound by any such resolution." *Id.*

9) *Statement On Signing the National and Community Service Act of 1990, Pub. Papers of George Bush 1613 (Nov. 16, 1990)*: President Bush rejected the constitutionality of provisions that required a Presidentially appointed board exercising executive authority to include, among its 21 members, "seven members nominated by the Speaker of the House of Representatives . . . [and] seven members nominated by the Majority Leader of the Senate." *Id.* at 1614. He announced that the restrictions on his choice of nominees to the board "are without legal force or effect." *Id.*

10) *7 A Compilation of the Messages and Papers of the Presidents 377 (Aug. 14, 1876) (Pres. Grant)*: This is one of the earliest of many instances of a President "construing" a provision (to avoid constitutional problems) in a way that seems to amount to a refusal to enforce a provision of it. An 1876 statute directed that notices be sent to certain diplomatic and consular officers "to close their offices." President Grant, in signing the bill, stated that, "[i]n the literal sense of this direction it would be an invasion of the constitutional prerogatives and duty of the Executive." *Id.* In order to avoid this problem, President Grant "constru[ed]" this provision "only to exercise the constitutional prerogative of Congress over the expenditures of the Government," not to "imply[] a right in the legislative branch to direct the closing or discontinuing of any of the diplomatic or consular offices of the Government." *Id.* at 378.

### Other Presidential Documents

1) *A Presidential Legal Opinion, 66 Harv. L. Rev. 1353 (1953)*: This was a legal opinion from President Franklin Roosevelt to Attorney General Jackson. President Roosevelt stated that he was signing the Lend-Lease Act despite a provision providing for a legislative veto, "a provision which, in my opinion, is clearly unconstitutional." *Id.* at 1357. The President stated that, "[i]n order that I may be on record as indicating my opinion that the foregoing provision of the so-called Lend-Lease Act is unconstitutional, and in order that my approval of the bill, due to the

existing exigencies of the world situation, may not be construed as a tacit acquiescence in any contrary view, I am requesting you to place this memorandum in the official files of the Department of Justice. I am desirous of having this done for the further reason that I should not wish my action in approving the bill which includes this invalid clause, to be used as a precedent for any future legislation comprising provisions of a similar nature." *Id.* at 1358.

2) *Message to the Congress on Legislative Vetoes, Pub. Papers of Jimmy Carter 1146 (Jun. 21, 1978)*: In this memorandum President Carter expressed his strong opposition to legislative vetoes and stated that "[t]he inclusion of [a legislative veto] in a bill will be an important factor in my decision to sign or to veto it." *Id.* at 1148. He further stated that, "[a]s for legislative vetoes over the execution of programs already prescribed in legislation and in bills I must sign for other reasons, the Executive Branch will generally treat them as 'report-and-wait' provisions. In such a case, if Congress subsequently adopts a resolution to veto an Executive action, we will give it serious consideration, but we will not, under our reading of the Constitution, consider it legally binding." *Id.* at 1149.

### Historical Materials

1) *Statement of James Wilson on December 1, 1787 on the Adoption of the Federal Constitution, reprinted in 2 Jonathan Elliot, Debates on the Federal Constitution 418 (1836)*: Wilson argued that the Constitution imposed significant — and sufficient — restraints on the power of the legislature, and that the President would not be dependent upon the legislature. In this context, he stated that "the power of the Constitution was paramount to the power of the legislature acting under that Constitution; for it is possible that the legislature . . . may transgress the bounds assigned to it, and an act may pass, in the usual *mode*, notwithstanding that transgression; but when it comes to be discussed before *the judges*,— when they consider its principles, and find it to be incompatible with the superior power of the Constitution,— it is their duty to pronounce it *void* . . . . In the same manner, the President of the United States could shield himself, and refuse to carry into effect an act that *violates* the Constitution." *Id.* at 445-46.

2) *Letter from Chief Justice Chase to Gerrit Smith (Apr. 19, 1868), quoted in J. Schuckers, The Life and Public Services of Salmon Portland Chase 577 (1874)*: Chase stated that President Johnson took the proper action in removing Secretary of War Stanton without Senate approval, in light of Johnson's belief that the statutory restriction on his removal authority was unconstitutional. In this regard, Chase commented that "the President had a perfect right, and indeed was under the highest obligation, to remove Mr. Stanton, if he made the removal not in wanton disregard of a constitutional law, but with a sincere belief that the Tenure-of-Office Act

was unconstitutional and for the purpose of bringing the question before the Supreme Court." *Id.* at 578.

## Congressional Materials

1) *The President's Suspension of the Competition in Contracting Act is Unconstitutional, H.R. Rep. No. 99-138, 1st Sess. (1985)*: The House Committee on Government Operations concluded that the President lacked the authority to refuse to implement any provision of the Competition in Contracting Act. The Committee stated that, "[t]o adopt the view that one's oath to support and defend the Constitution is a license to exercise any available power in furtherance of one's own constitutional interpretation would quickly destroy the entire constitutional scheme. Such a view, whereby the President pledges allegiance to the Constitution but then determines what the Constitution means, inexorably leads to the usurpation by the Executive of the others' roles." *Id.* at 11. The Committee also stated that "[t]he Executive's suspension of the law circumvents the constitutionally specified means for expressing Executive objections to law and is a constitutionally impermissible absolute veto power." *Id.* at 13.

2) *Memorandum from the Congressional Research Service to the Committee on Government Operations concerning "The Executive's Duty to Enforce the Laws" (Feb. 6, 1985), reprinted in Constitutionality of GAO's Bid Protest Function: Hearings Before a Subcomm. of the House Comm. on Government Operations, 99th Cong. 544 (1985)*: This memorandum stated that the President lacks the authority to decline to enforce statutes. The CRS argued that "[t]he refusal of the President to execute the law is indistinguishable from the power to suspend the laws. That power, as is true of the power to amend or to revive an expired law, is a legislative power." *Id.* at 554.

## Cases

1) *Myers v. United States, 272 U.S. 52 (1926)*: The President refused to comply with — that is, enforce — a limitation on his power of removal that he regarded as unconstitutional, even though the question had not been addressed by the Supreme Court. A member of Congress, Senator Pepper, urged the Supreme Court to uphold the validity of the provision. The Supreme Court vindicated the President's interpretation without any member of the Court indicating that the President had acted unlawfully or inappropriately in refusing to enforce the removal restriction based on his belief that it was unconstitutional.

2) *United States v. Lovett, 328 U.S. 303 (1946)*: The President enforced a statute that directed him to withhold compensation from three named employees, even

though the President believed the law to be unconstitutional. The Justice Department argued against the constitutionality of the statute in the ensuing litigation. (The Court permitted an attorney to appear on behalf of Congress, *amicus curiae*, to defend the statute.)

3) *INS v. Chadha, 462 U.S. 919 (1983)*: This case involved the withholding of citizenship from an applicant pursuant to a legislative veto of an Attorney General decision to grant citizenship. Despite a Carter Administration policy against complying with legislative vetoes (*see* Carter Presidential memorandum, *supra*), the executive branch enforced the legislative veto, and, in so doing, allowed for judicial review of the statute. As with *Lovett*, the Justice Department argued against the constitutionality of the statute.

4) *Morrison v. Olson, 487 U.S. 654 (1988)*: The President viewed the independent counsel statute as unconstitutional. The Attorney General enforced it, making findings and forwarding them to the Special Division. In litigation, however, the Justice Department attacked the constitutionality of the statute and left its defense to the Senate Counsel, as *amicus curiae*, and the independent counsel herself.

5) *Freytag v. Commissioner, 501 U.S. 868 (1991)*: A unanimous Court ruled that the appointment of special trial judges by the Chief Judge of the United States Tax Court did not violate the Appointments Clause. Five Justices concluded that the Tax Court was a "Court of Law" for Appointments Clause purposes, despite the fact that it was an Article I court, so that the Tax Court could constitutionally appoint inferior officers. Four Justices, in a concurrence by Justice Scalia, contended that the Tax Court was a "Department" under the Appointments Clause. The concurrence stated that "Court of Law" did not include Article I courts and that the Framers intended to prevent Congress from having the power both to create offices and to appoint officers. In this regard, the concurrence stated that "it was not enough simply to repose the power to execute the laws (or to appoint) in the President; it was also necessary to provide him with the means to resist legislative encroachment upon that power. The means selected were various, including a separate political constituency, to which he alone was responsible, and the power to veto encroaching laws, see Art. I, § 7, or even to disregard them when they are unconstitutional." *Id.* at 906 (Scalia, J., concurring).

6) *Lear Siegler, Inc., Energy Prods. Div. v. Lehman, 842 F.2d 1102 (9th Cir. 1988), withdrawn in part 893 F.2d 205 (9th Cir. 1990) (en banc)*: The President refused to comply with provisions of the Competition in Contracting Act that he viewed as unconstitutional and thereby allowed for judicial resolution of the issue. The Ninth Circuit rejected the President's arguments about the constitutionality of the provisions. The court further determined that Lear Siegler was a prevailing

party and was entitled to attorneys' fees, because the executive branch acted in bad faith in refusing to execute the contested provisions. In this regard, the court stated that the President's action was "utterly at odds with the texture and plain language of the Constitution," because a statute is part of the law of the land that the President is obligated to execute. *Id.* at 1121, 1124. On rehearing en banc, the court ruled that Lear Siegler was not a prevailing party and withdrew the sections of the opinion quoted above.